## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **GLORIA JOSEPH**, | |
| Plaintiff, | |
| v. | Case No. 22-cv-2881 (CRC) |
| **LAUREN MCFERRAN**, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

This case involves an employment dispute at the upper echelons of the agency tasked with managing labor relations in this country: the National Labor Relations Board ("NLRB" or "the Board").

Plaintiff Gloria Joseph served for more than two decades as the NLRB's Director of Administration and, during that period, was the highest-ranking African American woman at the agency. Joseph alleges that she was a model supervisor who reliably received top marks in her annual appraisals and garnered multiple awards for her management. That purportedly changed starting in 2010 when Lafe Solomon—a former manager whom Joseph had accused of race- and gender-based discrimination a year prior—became Acting General Counsel and her direct supervisor. Within two years, Solomon allegedly stripped Joseph of her role as Human Resources ("HR") Director and reformed the agency's financial-management structure to shift three branches out of Joseph's purview to that of a new Chief Financial Officer ("CFO"). After Joseph responded by filing another Equal Employment Opportunity ("EEO") complaint against Solomon, the Chairman of the Board requested that Joseph recuse herself from her ethical oversight duties as they related to anyone named in her complaint. And, while her complaint

was pending, the agency issued a Final Agency Decision ("FAD") in July 2012 finding Joseph had herself discriminated against another employee in her ranks.

Joseph retired from the agency the next month but continued to pursue her complaint within the NRLB and then before the Equal Employment Opportunity Commission ("EEOC"). After a decade of administrative proceedings ended in a finding in favor of the agency, Joseph filed this *pro se* action against current NLRB Chairperson Lauren McFerran in her official capacity. Joseph's complaint alleges unlawful discrimination, retaliation, and a hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. The Board has moved to dismiss the complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim on which relief can be granted. Joseph has responded with a motion for partial summary judgment under Rule 56 on her claim regarding the ethics recusal. For the reasons that follow, the Court will grant the Board's motion in part and deny it in part, and deny Joseph's motion in its entirety.

## I. Background

The Court draws the following background from Joseph's complaint and the extensive materials that she appended to her opposition. See Schnitzler v. United States, 761 F.3d 33, 38 (D.C. Cir. 2014) (noting that courts may consider a *pro se* litigant's "filings as a whole before dismissing a complaint"). The Board no doubt contests many of her allegations.

Gloria Joseph is an African American woman and was in her early sixties at the time of the events at issue. Compl. ¶¶ 2, 8. For the last 22 years of her multidecade tenure at the NLRB, Joseph served as the Director of Administration—a Senior Executive Service position that sits directly under the General Counsel in the NLRB's chain of command. Id. ¶¶ 2, 8, 13. In that

role, Joseph supervised seven branches: Human Resources, Budget, Finance, Acquisitions, Facilities and Property, Security, and Library and Administrative Services.  Id. ¶ 13.  Beyond that broad suite of responsibilities, she also served as the Board's Designated Agency Ethics Officer ("DAEO").  Id. ¶¶ 8, 13.  Joseph alleges that, at the time of her departure, she was the "sole minority and most experienced manager of her peers (Caucasian fellow division heads who also reported to the Acting General Counsel)" and "the highest-ranking minority in a career position at the Agency."  Id. ¶ 13.

In her telling, Joseph was a standout employee who was "consistently recognized for excellence in her appraisals for her management of the programs for which she was responsible and had received numerous outstanding annual ratings under multiple General Counsels to whom she reported as a division head."  Id. ¶ 15.  These rave reviews continued right up until her final years at the agency, as she received "outstanding" ratings in her 2010 and 2011 appraisals.  Id.  The former Deputy General Counsel, who supervised Joseph for ten years, described her as a top-notch manager who ran "a good, smooth operation."  Id.  Her professional performance also garnered acclaim outside the agency:  She "received the Presidential Meritorious Rank Award, which honors sustained extraordinary accomplishment at an executive level, and the Office of Government Ethics' Outstanding Ethics Program Award."  Id.

But Joseph purportedly had bad blood with one individual at the agency, Mr. Solomon, stemming at least as far back as 2009.  The NLRB is a bifurcated agency governed on one side by a General Counsel who investigates and prosecutes cases and on the other side by a five-member Board that serves as a quasi-judicial body in deciding cases.  Back in 2009, Joseph and other members of the Division of Administration filed an EEO complaint "focused on race[-] and gender-based discriminatory treatment of the largely minority and female managers of Plaintiff's

division by white male Board-side managers, particularly Solomon, then the head of the small Representation Case Unit, and the history of lack of diversity and inclusion on the Board-side of the agency." Id. ¶ 18.  Relevant here, Joseph "had objected to Solomon's assuming authority over her, such as his attempt to create a CFO position without [her] knowledge despite his lack of responsibility for financial management." Id.  The agency settled the complaint later that year.  Id.  Per the settlement, then-Chairperson Wilma Liebman "engaged an experienced consultant team" which, after interviewing managers of both halves of the agency, issued a report finding "that the dynamics of race were potent." Id. ¶ 19.  "Solomon was one of only two Board-side managers specifically singled out for particularly problematic roles in negative racial dynamics." Id.  Chairperson Liebman also issued a memorandum in September 2009 "committing to change the treatment of Administration managers by Board-side managers." Id.

Nine months later, in June 2010, Solomon switched sides at the agency when he took over as the Acting General Counsel—a position that placed him in direct control of Joseph.  Id. ¶ 20.  As Joseph sees it, the problems began soon after when Solomon's "surrogates" advised Joseph's deputy to distance herself from Joseph.  Id.  Those warning shots proved prophetic, Joseph maintains, as Solomon quickly began "stripping away [her] duties and giving them to white managers in other divisions, such as labor relations, or requiring deferral to white managers in other divisions on matters under her supervision." Id.  In particular, Joseph alleges that Solomon steadily scaled back her responsibilities across three domains: (1) human resources; (2) financial management of budgeting, accounting, and contracting; and (3) ethical oversight of officials at the agency.  At each step along the way, Joseph raised concerns with the agency's EEO office.  But rather than address her concerns, Joseph alleges that the EEO office struck new ground in July 2012 when, for the first time in the NLRB's history, it issued a FAD

finding Joseph and her deputy had discriminated against another employee within their division. Id. ¶ 17.

*Human Resources.*  It started with human resources, Joseph says.  In September 2011, she claims she was invited to a meeting with Solomon, Deputy General Counsel Celeste Mattina, and Executive Assistant Jennifer Abruzzo.  Id. ¶ 21.  At the meeting—during which Joseph says she was "subjected to screaming by Abruzzo . . . which neither Solomon nor Mattina attempted to prevent"—Solomon reported that Joseph's division suffered a "morale problem" but refused to disclose the sources behind this complaint.  Id.  Solomon then informed Joseph that he had retained Ellyn McKay, a one-person firm hired outside of the ordinary procurement process, to perform a specialized assessment of the division even though an experienced consulting firm, STGi, was already conducting an agency-wide study to explore why the NLRB as a whole had performed poorly on the annual Office of Personnel Management's Employee Viewpoint Survey ("EVS").  Id. ¶¶ 21, 23.  At first, Solomon directed the Administration Division that it was not to participate in the EVS focus groups, restricting it to the McKay report and channeling all internal communication about the report through Abruzzo.  Id. ¶ 23.  He later reversed course, however, after Joseph "pointed out the racial disparity in this directive."  Id.

McKay presented a summary of her findings at a meeting on January 20, 2012.  Id. ¶ 24. The report did not paint Joseph in a flattering light and, from Joseph's vantage, it "was not an assessment of the division, but a personal attack on [her] and her deputy, using anonymous quotes and [applying] arbitrary, unsourced standards."  Id.  Additionally, Joseph alleges that email traffic between Abruzzo and McKay reveals that Solomon and others in the General Counsel's Office may have had an improper hand in steering the report's conclusions, including through detailed discussions about what should be included in the report and "how to

characterize and highlight negatives." Id. ¶ 24 n.3.  Solomon and Abruzzo also purportedly parried Joseph's requests to access McKay's underlying data.  Id. ¶ 25.  Without the benefit of this data, on February 1, Joseph and her deputy presented their rebuttal to the McKay report in which they touted Joseph's track record of "outstanding" performance reviews and presented opinions from outside experts that the survey "had a severely flawed methodology, was unprofessional, had improper content, and was being used for an inappropriate purpose."  Id. ¶¶ 25–26.  They also "pointed out that even with her flawed methodology and clear bias, McKay actually showed that [Joseph's] division was performing better than the rest of the agency when [McKay's] data was aligned with similar questions from the EVS but that no other division head was being accused of mismanagement based on the EVS data."  Id. ¶ 26.  Five days after this "counter-presentation," Joseph raised concerns with Solomon and NLRB Chairman Mark Pearce that "recent actions by Solomon were resurfacing racial tensions which were supposed to have been addressed by the settlement of [Joseph's] EEO charge of 2009."  Id. ¶ 17.

Unmoved by Joseph's critiques, Solomon issued memoranda on March 2 and 12 in which he repeated the McKay report's findings and recommended that Joseph's Human Resources role be scaled back with Abruzzo appointed as her "overseer."  Id. ¶¶ 30–31.  Weeks later, at a meeting on March 22, Joseph was informed that Abruzzo would be taking on a more active role in Human Resources oversight for the interim and that agency management would eventually select a new Human Resources Director.  Id. ¶ 32.  This was followed by an email to Joseph's staff the next day announcing Abruzzo's increased role.  Id. ¶ 33.  On April 10, Joseph was issued a "disciplinary memo" containing additional critiques from unnamed sources as well as a comment attributed to one employee who, Joseph claims, subsequently denied under oath making the statement to Abruzzo.  Id. ¶ 34.  Two weeks later, Joseph requested that Solomon

and Chairman Pearce join her in a mediation program to resolve their differences, but Pearce never responded and her mediation with Solomon proved unsuccessful.  In response, Joseph reached out to the EEO counselor on May 2.  Id. ¶ 36.

All the while, Solomon and Abruzzo marched forward with their efforts to reorganize the HR branch.  Abruzzo held planning meetings with five senior employees, excluding Joseph and her deputy, in which she purportedly referred to one employee who opposed the reorganization as a "spy" who was "aligned [with] Ms. Joseph."  Id. ¶ 38.  Joseph also alleges that, during her time at the helm, Abruzzo repeatedly referred to the largely minority human-resources staff as "you people" and publicly "dressed down the African-American branch chief in front of her staff."  Id. ¶ 39.  Upon learning that the proposed reorganization was going into effect, Joseph amended her EEO complaint on May 22 and formalized that complaint on June 12.  Id. ¶ 41.  Six days later, on June 18, Solomon notified Joseph that he was "removing the HR Branch from her supervision."  Id.  Joseph once more amended her EEO complaint on June 24 to include this removal, which she claimed was done in a "disparate manner" by Solomon who harbored "race and gender-based animus towards" her.  Id. ¶¶ 17, 43.

*Financial Management.*  While the dispute over the human-resources branch was ongoing, Solomon spearheaded another reorganization that ultimately removed the three financial-management branches from Joseph's supervision.  Sometime in the spring of 2012, Solomon followed through on his prior plans to create a new CFO position at the NLRB by contracting with the National Academy of Public Administration ("NAPA"), which commenced a review of the agency's financial-management systems and practices on May 2.  See Mot. Dismiss, Ex. 1 ("NAPA Final Briefing"), at 3, 5.  The NAPA's statement of work was to "provide expert review, analyses and recommendations regarding the scope and need for a Chief

Financial Officer (CFO) position to improve NLRB's financial management structure" and "develop recommendations" based on "a comparative data review to benchmark practices for financial management structures in similar Federal agencies." Id. at 3.

In its final report, delivered on June 14, the NAPA advisory group recommended that the NLRB restructure its financial-management processes by creating a new CFO position to oversee budgeting, accounting, and contracting. Id. at 5, 14–15. That recommendation aligned with The Chief Financial Officers Act of 1990 ("CFO Act"), which required all executive agencies to appoint a CFO who "report[s] directly to the head of the agency regarding financial management matters." 31 U.S.C. § 902(a)(1). Though the CFO Act did not bind smaller, independent agencies like the NLRB, many such agencies have voluntarily adopted the CFO model. See NAPA Final Briefing at 8–10. The NAPA advisory group recommended that the NLRB follow suit. Id. at 14.

On June 27, Chairman Pierce forwarded the NAPA report to Joseph along with a draft Federal Register notice announcing the creation of the CFO position. Compl. ¶ 46. The email stated that the Board would be meeting the next day to discuss the proposal. Id. Joseph claims to have been informed that neither she nor the financial-branch chiefs, who were predominately female and members of minority groups, could attend even though Board-side managers—who were "overwhelmingly white and male" and lacked "familiarity with federal financial management"— were "invited to the meeting that resulted in the removal of the financial branches" from their purview. Id. Joseph and her managers were "stunned" by the report because the NAPA members "had been complimentary of the financial program" during their meetings and because Joseph had received awards for her management of the agency's coffers. Id. ¶¶ 44, 47. When the financial-branch managers challenged the NAPA report as "one-sided

and unfair," Abruzzo assured them that Joseph, "not the financial branch chiefs, was the target of the report." Id. ¶ 47.  And on July 18, without consultation, Joseph was informed that the financial branches were being removed from her authority and placed under the control of a new CFO, who was a white male.  Id. ¶ 48.

That July, Joseph amended her EEO complaint to include the removal of her financial-management branches.  Id. ¶ 17.  She claimed that the shakeup was performed in a "disparate manner" because no other division had lost functions.  Id. ¶ 49.  She also claimed that this reorganization differed markedly from other "changes in the agency's structure" such as the consolidation of regional field offices, which was done in consultation with the regional directors and took effect only after a director retired, or the headquarters restructuring, which "took over a year to implement" and did not cite "lack of management skills by a particular individual" as a reason for the overhaul.  Id. ¶¶ 52–53.  By contrast, she argued, the financial restructuring occurred on an accelerated timeline over the course of mere months and via a closed-door process in which Joseph and her division managers were locked out.  Id.

*Ethics*.  Joseph's struggle with Solomon soon led to the third "stripping" of her duties: this time, her role as the agency's ethics officer.  As part of her ethics responsibilities, Joseph was tasked with approving travel vouchers paid for by third parties.  Id. ¶ 56.  Sometime after Joseph had lodged her grievance with the EEO, Solomon complained to the agency's Inspector General ("IG") David Berry that Joseph was slow-walking the processing of his vouchers—an allegation that Joseph insists "was provably and irrefutably false."  Id. ¶¶ 55–56.  But taking Solomon at his word, and without follow-up or further investigation, IG Berry purportedly contacted an official at the Office of Government Ethics ("OGE") on June 13—the day after Joseph had formalized her complaint—and was advised "that [Joseph's] filing of an EEO

complaint presented a conflict of interest regarding [her] handling of ethics duties." Id. ¶¶ 55, 57. IG Berry relayed that guidance to Solomon in a memo on June 26, copying Chairman Pearce. Id. ¶ 57. The following day, Chairman Pearce sent Joseph a memorandum stating:

> Based on information received from the Office of Government Ethics through the Inspector General your EEO complaint created a conflict of interest for you to perform [Designated Agency Ethics Officer (DAEO)] duties with regard to Acting General Counsel Lafe Solomon . . . . In addition, I direct that you recuse yourself from acting as the DAEO with respect to anyone else named in your pending EEO complaint against the Acting General Counsel. I have not seen, nor do I have access to, the complaint. Therefore, please inform me immediately of the additional recusals, if any, that you will make.

Opp'n, Ex. 6 ("Pearce Memo"), at 1. Ethics duties for the individuals named in Joseph's EEO complaint were reallocated to Robert Schiff, a "white, male, non-career, Board-side employee with no ethics experience." Compl. ¶ 58.

Joseph amended her EEO complaint again on July 5 to include the removal of these ethics responsibilities, alleging that the removal was blatant retaliation for reporting prior grievances. Id. ¶¶ 17, 62. She maintains that Solomon and Pearce did not confer with agency counsel or the EEO office before issuing the memorandum, nor did either communicate with the OGE to verify the advice that IG Berry had received. Id. ¶ 59. As it turns out, the OGE later recanted that advice, admitting it should not have used the label "conflict of interest" because "that term conveys a financial conflict that was not found by dint of the EEO filing." Id. After this retraction, Joseph claims the agency "shifted its defense to arguing that there was an 'appearance' of a conflict of interest rather than an *actual* conflict." Id. ¶ 62. Also, at the same time IG Berry was taking action to remove Joseph for this perceived conflict, Joseph alleges he was investigating Solomon for an actual "violation of a Title 18 financial conflict of interest matter which had been referred to him by [Joseph] in her capacity of Ethics Officer." Id. ¶ 60. After Joseph complained, the Integrity Committee of the Council of the Inspectors General on

Integrity and Efficiency purportedly determined that IG Berry had engaged in administrative misconduct by intervening in the conflict between Joseph and Solomon while simultaneously investigating Solomon based on Joseph's referral.  Id.

*Finding of Discrimination*.  The final straw came on July 13 when NRLB counsel informed Joseph that the agency was issuing a FAD finding that Joseph and her deputy had discriminated against Michael Gonzalez, a supervisor within their HR division.  Id. ¶ 63.

Gonzalez had filed an internal complaint alleging that five individuals had discriminated and retaliated against him in violation of Title VII: Joseph, her deputy, Solomon, the HR Director, and the prior HR Director.  Id. ¶ 64.  In Joseph's telling, the agency's counsel described it as a "slam dunk" for management and "expressed strong misgivings about its validity."  Id. ¶¶ 63, 65.  To Joseph's shock, then, the EEO office issued a FAD that absolved Solomon, the HR Director, and the previous HR director, but found Joseph and her deputy had discriminated against Gonzalez on the basis of sex, color, and national origin and acted in a retaliatory manner by laterally transferring him and relocating his office.  Id. ¶ 64.  According to Joseph, this "was the first time in the Agency's history that an alleged meritorious FAD had [been] issued" because, "[i]n the past, management would negotiate a settlement rather than issue a FAD finding that an agency whose mission is to protect rights in the workplace had violated Title 7."  Id. ¶ 67.  Joseph alleges the agency did reach a generous settlement agreement with Gonzalez— but, in a stark break from standard practice, it did so only *after* issuing the first-ever meritorious FAD.  Opp'n at 29–30.

The groundbreaking decision pinning the blame on Joseph just one week after she had amended her complaint to include the removal of ethics and financial-management duties was hardly a coincidence, she contends.  Joseph notes that the "FAD was issued by the EEO office,

which Abruzzo claimed to supervise, and involved a branch (HR) over which she had assumed supervision" following the branch's reorganization.  Compl. ¶ 64.  Joseph also alleges Abruzzo had "been meeting regularly with Gonzalez as early as November 2011."  Id.  By contrast, and unlike how her "peers were treated under similar circumstances," Joseph claims there were "no communications from Solomon or his surrogates with [her] on this matter at any time."  Id. ¶ 65.  She also contends that Celeste Mattina, "Solomon's deputy and *alter ego*, reviewed the draft of the FAD before it [was] issued," in clear violation of "written Agency protocol regarding EEO procedures" requiring that "when a review of a draft FAD by the Deputy would pose a conflict of interest, the GC would make other appropriate arrangements for review of the draft."  Id. ¶ 66.  Assembling these puzzle pieces, Joseph maintains that she was subjected to disparate and unfair treatment as part of an orchestrated effort to tarnish her reputation and undermine her own claims of discrimination.

Succumbing to this perceived mistreatment, Joseph retired from the agency on August 2, 2012, but she continued to pursue her EEO complaints.  Id. ¶¶ 10, 17.  Following the agency's own investigation, Joseph timely invoked her right to a hearing before an EEOC administrative judge, who held a five-day hearing in March 2016.  Id. ¶ 10.  Her complaint then sat dormant for five years until the administrative judge issued a finding in favor of the NLRB in May 2021.  Id.  Joseph appealed that decision to the EEOC's Office of Field Operations, which denied the appeal in June 2022.  Id. ¶ 11.  Within 90 days of receiving that final decision, Joseph filed a *pro se* complaint in this Court alleging unlawful discrimination, retaliation, and a hostile work environment under Title VII and age discrimination under the ADEA.  Id. ¶¶ 3, 4, 12.  The NLRB responded by filing a motion to dismiss the complaint in its entirety under Federal Rule of Civil Procedure Rule 12(b)(6) for failure to state a claim on which relief can be granted.  Not to

be outdone, Joseph moved for partial summary judgment on her claim that the Board pared back her DAEO duties in retaliation for her filing an EEO complaint.

## II.    Legal Standards

In analyzing a Rule 12(b)(6) motion, the Court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  The Court must "construe the complaint 'liberally,' granting plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  However, it "need not accept a plaintiff's legal conclusions as true" nor "presume the veracity of legal conclusions that are couched as factual allegations." Alemu v. Dep't of For-Hire Vehicles, 327 F. Supp. 3d 29, 40 (D.D.C. 2018).  The Court also "may consider a document that a complaint specifically references without converting the motion into one for summary judgment." Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1133 (D.C. Cir. 2015).

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), and from retaliating against any employee who opposes an unlawful employment practice or participates in an employment discrimination proceeding, see id. § 2000e-3(a).  Title VII also makes it unlawful to require "people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  The ADEA similarly safeguards against age

discrimination in the workforce by enacting an analogous set of protections for those over 40 years of age.  See 29 U.S.C. § 631 et seq.

To plead a viable discrimination claim under Title VII, a plaintiff must allege that she suffered an "adverse employment action" because of her race, color, religion, sex, or national origin.  Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  As the D.C. Circuit recently clarified, a plaintiff does not need to show that the challenged employment action resulted in "objectively tangible harm" so long as she was discriminated against with respect to the "terms, conditions, or privileges of employment."  Chambers v. District of Columbia, 35 F.4th 870, 872, 874–75 (D.C. Cir. 2022) (en banc) (quoting 42 U.S.C. § 2000(e)-2(a)(1)).  "[A]t the motion-to-dismiss stage, the guiding lodestar is . . . , assuming the truth of the factual allegations, taken collectively, whether the inferences of discrimination drawn by the plaintiff are reasonable and plausibly supported."  Townsend v. United States, 236 F. Supp. 3d 280, 298 (D.D.C. 2017).

To make out a plausible retaliation claim, a plaintiff must establish that she "(1) opposed an unlawful employment practice; (2) the employer took a materially adverse personnel action; and (3) a causal connection existed between the two."  Leyden v. Am. Accreditation Healthcare Comm'n, 83 F. Supp. 3d 241, 245 (D.D.C. 2015).  In this context, a materially adverse action is one that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).  A plaintiff at the pleading stage must "establish facts adequate to permit an inference of retaliatory motive."  Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985).

Finally, to state a claim of hostile work environment under Title VII, a plaintiff must allege "'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive

to alter the conditions of the victim's employment and create an abusive working environment.'"
Baloch, 550 F.3d at 1201 (quoting Harris, 510 U.S. at 21).

### III.  Analysis

The Board paints Ms. Joseph's complaint as alleging, without support, a "vast conspiracy orchestrated by the Acting General Counsel" to "strip her of some of the branches that she supervised, as well as certain ethics duties."  Mot. Dismiss at 1–2.  There is something to this charge.  Joseph asserts that, for one reason or another, Mr. Solomon had it out for her and leveraged his influence to oust her from various posts.  But, in doing so, she presents no direct evidence that Solomon acted on a discriminatory or retaliatory impulse or that others were either in on the scheme or unwitting conduits of his unfair prejudice.  At the same time, Joseph's allegations are not quite as far-fetched as the Board suggests.  While lacking direct evidence of wrongdoing, Joseph alleges she has a history with Solomon—dating back to her 2009 EEO complaint against him and other Board-side managers—and that, soon after taking over as Acting General Counsel, he began to tarnish her reputation and remove her from key posts.  Granting Joseph the benefit of all reasonable inferences, as it must, the Court finds that this core allegation meets the low bar of plausibility at this early stage of proceedings.  Accordingly, the Court will deny the Board's motion to dismiss the Title VII claims in relation to (1) the removal of Joseph's HR responsibilities; (2) the removal of her financial-management duties; (3) the FAD finding Joseph had discriminated against another employee; and (4) Joseph's hostile work environment claim.[1]

---

[1]  However, because Joseph did not plausibly allege that any of these decisions were based on her age, the Court will dismiss all ADEA claims.

By contrast, the Court will dismiss all allegations related to Chairman Pearce's decision to recuse Joseph from ethical oversight duties over the individuals named in her pending EEO complaint. The Court does not find it plausible that the Chairman's decision was reprisal for Joseph filing her EEO complaint; rather, it plainly appears to be an entirely sensible decision to avoid any real or perceived conflict of interest in a domain where open communication and trust are essential. And even if there were evidence of retaliation here, the Court finds that such a limited recusal would not dissuade a reasonable worker from making a charge of discrimination and thus cannot serve as the basis for a Title VII retaliation claim.

A. <u>Human Resources</u>

Starting with her human-resource responsibilities, the Court concludes that Joseph has met her burden of alleging sufficient facts to give rise to a reasonable inference that the decision to remove her as the head of the HR branch may have constituted discrimination based on her race and gender or unlawful retaliation based on her 2009 EEO complaint against Solomon and other Board-side managers.

Although Joseph has not advanced any direct evidence that Solomon was motivated by discriminatory animus or retaliatory vengeance, a plaintiff also may meet her burden through indirect evidence that gives rise to a reasonable inference. Perhaps the most common way plaintiffs attempt to prove an unlawful employment action via circumstantial evidence is by alleging they were "treated differently from similarly situated employees who are not part of the protected class" and by demonstrating that this uneven treatment was not supported by different performance levels. <u>George v. Leavitt</u>, 407 F.3d 405, 412 (D.C. Cir. 2005). Joseph has done that here.

Taking her allegations as true, as the Court must, Joseph was widely recognized as a star supervisor at the agency who had successfully managed the HR branch for over 20 years and enjoyed a stellar working relationship with colleagues.  The one exception was her dynamic with white male Board-side managers, particularly Solomon, whom she accused of race- and gender-based discrimination in 2009.  As soon as Solomon crossed the agency's dividing line when he was appointed Acting General Counsel, Joseph began hearing rumblings that Solomon was out to get her.  Those rumors were soon borne out.  For years, including the two years prior to her removal, Joseph consistently had "outstanding" ratings in her annual appraisals.  But suddenly, and without citing concrete support, Solomon claimed there was a "morale" problem in the HR division and commissioned McKay to assess Joseph's performance even though the NRLB had already contracted with a different firm, STGi, to assess the agency's low EVS scores across all the various departments.  Solomon then used the McKay report, which Joseph claims was biased, to remove the HR branch from the oversight of the agency's sole minority director and reassign it to a white man.  Based on these alleged facts, and drawing all reasonable inferences in her favor, the Court finds Joseph plausibly alleged that the removal of the agency's highest-ranking African American woman from the top of the HR division was the product of an illicit desire to pare back her duties—either because of her identity or because of her prior EEO complaint.

The Board disagrees, of course.  From its vantage, the McKay report proves Joseph's removal was not the result of animus or retribution but instead a legitimate decision based on Joseph's subpar performance.  See Mot. Dismiss at 3–4.  There are at least two issues with this view of things, however.  Before getting to the McKay report, Joseph's allegations raise questions as to why she was singled out for a specialized review in the first place.  While Solomon justified his decision to commission McKay by citing a "morale problem" within the

HR ranks, these problems were never flagged in Joseph's annual performance reviews, including the 2010 and 2011 appraisals, which awarded her top marks as a manager. If the morale issues were so dire as to warrant commissioning a special investigation, one would expect some warning signs beforehand. Solomon also shed little light on how the morale issue came into sudden view, as his sources were left unnamed. The McKay report's murky origins only heighten the mystery surrounding Joseph's abrupt fall from grace.

The Board insists that the mystery is solved if one turns the pages of the McKay report which, in its reading, largely "confirmed" the reports of a "morale problem" by showing that Joseph "was mismanaging her division." Id. at 8. But that interpretation of the McKay report is disputed. In addition to critiquing its "flawed methodology" and "clear bias," Joseph maintains that the McKay report still "showed that [her] division was performing better than the rest of the agency when [McKay's] data was aligned with similar questions from the EVS but that no other division head was being accused of mismanagement based on the EVS data." Compl. ¶¶ 25–26. If true, this fact would offer some, albeit limited, support for Joseph's claim that she was being singled out and treated differently from fellow division heads, many of whom were white men.

In sum, while lacking direct evidence, the indirect evidence described in the complaint that Solomon targeted Joseph for removal despite her glowing reviews and without a clear-cut justification is enough to raise a reasonable specter that her removal may have been discriminatory or unlawful reprisal for her prior EEO complaint.

B.  Financial Management

Joseph has a much steeper mountain to scale when it comes to the NLRB's decision to reform its financial management by reassigning three financial branches from Joseph to a new CFO. Many agencies have moved to a CFO model, and a panel of NAPA advisors

recommended the NLRB follow suit after a months' long study of its financial-management practices revealed deficiencies.  But given this shakeup was spearheaded by Solomon while he was also removing Joseph from her role as HR Director, granting all reasonable inferences in Joseph's favor, the Court must view the two decisions not as independent incidents but as part of an overall plan to reduce her role.  From that panoramic perspective, the Court finds that Joseph has alleged just enough to get to discovery on both sets of claims.

   The claims involving Joseph's management of the financial divisions are certainly on weaker footing than her HR claims.  Unlike Joseph's HR responsibilities, the decision to reform the agency's financial-management practices was not necessarily targeted at Joseph or an indictment of her managerial bona fides.  Rather, Solomon was recommending that the NLRB follow the lead of numerous independent agencies—such as the Federal Trade Commission, the Federal Communications Commission, and the Equal Employment Opportunity Commission— that have voluntarily adopted the approach to financial management that the CFO Act of 1990 required executive agencies to follow.  See NAPA Final Briefing at 8–9.  There is also little basis for finding Solomon's support for the CFO model was retaliation for Joseph engaging in protected activity:  Solomon advocated the CFO model *before* Joseph filed her initial EEO complaint in 2009—in fact, "his attempt to create a CFO position" was one of the chief grievances in that complaint, see Compl. ¶ 18—and the NAPA kicked off its study of the NLRB on May 2, 2012, the *same day* Joseph first reached out to the EEO counselor, see id. ¶ 36; NAPA Final Briefing at 5.  The NAPA final report also appears to vindicate Solomon, finding deficiencies in the existing financial management that, in its view, could be cured with the CFO model.  See NAPA Final Briefing at 11–12.

Also, in contrast to the decision to remove Joseph as HR Director, Solomon did not make the final call to create the CFO position.  That decision was made by the Board at its meeting on June 28, 2012, and Joseph offers no reason to believe that the Board as a whole was somehow in on some grand scheme against her.[2]  Absent a plausible allegation that the Board itself was prejudiced, then, Joseph's only available route to recovery is through a "cat's paw" theory of liability under which employers can be held responsible when "a formal decision maker [is] an unwitting conduit of another actor's [discriminatory or retaliatory] motives."  Walker v. Johnson, 798 F.3d 1085, 1095 (D.C. Cir. 2015).  Yet it is far from clear whether that theory would apply here.  Even if Joseph can show that Solomon had a discriminatory or retaliatory motive in pushing for the CFO model—a big if indeed—she will still need to demonstrate that this motive somehow tainted the Board's decision.  It may well be that in accepting the NAPA's independent recommendation, the Board's decision was insulated from any illicit motivation.  See id. (noting that a biased recommendation will not taint an employment action if the final decision maker decides, after an independent investigation, that the action is "entirely justified").

Despite the multitude of potential issues with Joseph's claim, any one of which may prove fatal, the Court nonetheless finds Joseph has alleged just enough to plausibly state a claim here.  As noted above, Joseph alleges Solomon's advocacy of the CFO model was not an isolated event but part and parcel of a broader scheme to strip her managerial responsibilities.  Given that Solomon contracted the NAPA report in the spring of 2012, the same period in which he was removing Joseph from her HR Director position, this is not an unreasonable inference.

---

[2]  Joseph gestures toward this possibility when alleging that the restructuring of the financial-management branches proceeded on a faster timeline and otherwise did not mirror the NLRB's approach to consolidating regional field offices or restructuring the headquarters.  But this apples-to-oranges comparison is far from sufficient to plausibly allege a claim that the Board had any improper motive when it created the CFO position.

Moreover, there is at least some suggestion of circumstantial evidence supporting Joseph's fears that the financial restructuring was indeed targeted at her—indeed, Abruzzo allegedly assured the financial branch chiefs that Joseph was "the target of the [NAPA] report."  Compl. ¶ 47.  On a similar score, construing the allegations in Joseph's favor, the NAPA group's findings do not necessarily vindicate Solomon's advocacy of the CFO model.  Joseph alleges that she and her managers strongly contested the NAPA report's findings regarding their financial management, which had garnered awards and the highest rankings in past annual reviews and suggests Solomon and his surrogates may have colored the NAPA's view.  Id. ¶¶ 44–47.  Though she offers no direct evidence for the latter allegation, it is at least plausible that Solomon, a top-ranking official who had procured the NAPA's services, had a hand in informing the group and possibly steering its conclusions.  To the extent Solomon was not walled off from the study, the cat's paw theory becomes more viable because, in that case, the Board's decision would have been informed by Solomon's own assessment.  See Walker, 798 F.3d at 1095 ("If the disciplinary committee was independent of and insulated from LeRoy's influence, that break in the chain would have rendered inoperative any illicit motive LeRoy might have had regarding the discipline.  If, however, LeRoy played a role informing the committee about Walker and her conduct, the committee becomes the conduit of his prejudice—his cat's-paw." (cleaned up)).

The Court will therefore deny the motion to dismiss as it relates to the decision to reduce Joseph's financial-management responsibilities so that she can pursue discovery on this matter alongside the allegations concerning the HR Branch, which Joseph contends ought to be viewed in tandem.  However, the Court reiterates that Joseph has a hard row to hoe going forward.  Lobbing allegations of discrimination and retaliation is one thing; proving them is quite another.  As the case progresses, not only must Joseph present evidence that Solomon had an illicit

purpose when advocating for the CFO model, but she also must prove this improper motive infected the Board's decision.  For now, though, the Court will withhold judgment until it sees what discovery unearths.

      C.  <u>Ethical Duties</u>

Turning to her role as the Designated Agency Ethics Officer, Joseph contends that the revocation of her ethical oversight duties for the individuals named in her complaint is an open-and-shut case of retaliation because Chairman Pearce admitted in his June 27 memorandum that he was removing these ethical duties because Joseph had filed an EEO complaint.  <u>See</u> Pl's Mot. Partial Summ. J. ¶¶ 24–25.  Therefore, in her eyes, this claim checks all the boxes of retaliation: (1) she engaged in protected activity when filing her EEO complaint; (2) her employer removed her ethics duties less than two weeks after she formalized her complaint; and (3) in her employer's own account, there was a direct causal connection between the two.  <u>See</u> <u>Leyden</u>, 83 F. Supp. 3d at 245.  The Court disagrees.

This checklist approach glosses over the crucial requirement that Chairman Pearce acted on a "retaliatory motive" when he shifted these ethical responsibilities away from Joseph. <u>Mitchell</u>, 759 F.2d at 86.  There is instead every indication that the Chairman had a "legitimate, non-retaliatory" reason for requesting that Joseph recuse herself from serving as the DAEO for any person named in her complaint.  <u>Jones v. Bernanke</u>, 557 F.3d 670, 672 (D.C. Cir. 2009).  As Chairman Pearce's memorandum makes clear, the decision for Joseph to recuse from her ethical responsibilities over individuals named in her complaint was done at the advisement of the OGE to avoid any conflict of interest.  That decision seems not only legitimate but patently sensible. Faced with reasonable official justification, and without any real reason to find pretext, it is far

too speculative to assume that the Chairman—or the OGE, for that matter—harbored some illicit desire to smite Joseph for availing herself of the agency's grievance system.

Joseph points out that the OGE's advice was inaccurate: Her serving as the DAEO did not actually present a "conflict of interest," as the OGE has defined it, because that term refers narrowly to a *financial* conflict of interest that was absent here. See, e.g., 5 C.F.R. § 2640.103. But that elevates regulatory semantics over actual substance. Even if the terminology does not exactly fit, the fact remains that having Joseph serve as the ethics officer over individuals named in her pending EEO complaint creates an obvious tension. DAEOs are responsible for reviewing possible conflicts of interest within the agency, referring potential violations, and, perhaps most importantly of all, counseling and advising other employees about their ethical responsibilities. See 25 C.F.R. § 700.509. Across each of these functions, open communication and trust are imperative, which even the appearance of a conflict can upend. Moreover, in the colloquial sense, a "conflict of interest" is not limited to pecuniary conflicts, and there are many factors beyond monetary considerations that can warrant recusal. Joseph's complaint proves the point. She maintains that IG Berry should not have intervened in this dispute because he was in charge of investigating her prior referral of Solomon's alleged ethics lapse. See Compl. ¶ 60. IG Berry had no money on the line, but his dual involvement nonetheless created at least the appearance of a conflict. Similarly, Joseph maintains that Deputy General Counsel Celeste Mattina's review of the FAD prior to its release violated "the EEO Office's conflict of interest protocols regarding review of FADs when an agency head's behavior is implicated in the EEO complaint leading to the FAD." Id. ¶ 17. Just as it presents a "conflict of interest" for the Deputy General Counsel to review a FAD implicating her boss, it is equally problematic to have a DAEO make ethical evaluations of persons named in her ongoing EEO complaint. Thus, while the OGE may have

erred in dubbing this a "conflict of interest" under its rules, there was still a conflict of sorts that justified the Chairman's decision.

Even if Chairman Pearce was not himself improperly motivated, Joseph contends that the decision was nevertheless tainted by Solomon's desire for reprisal under a "cat's paw" theory of liability, discussed above. See Walker, 798 F.3d at 1095. To prevail on a cat's paw theory, a plaintiff must demonstrate that "[1] a supervisor perform[ed] an act motivated by [retaliatory animus], [2] that [was] intended by the supervisor to cause an adverse employment action, and . . . [3] that act is a proximate cause of the ultimate employment action." Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011). Joseph contends that Solomon acted in retaliation to her EEO complaint, which she had officially filed the day before, when he contacted IG Berry with the purportedly bogus allegation that she was tardy in processing his travel vouchers. See Compl. ¶ 56. That false charge, she contends, was trained at removing her from her DAEO post and, at least partially, succeeded in doing so.

Though more colorable, this "cat's paw" theory of liability falters at the third prong: proximate causation. Even assuming that Solomon acted improperly when he complained to IG Berry and that his complaint was a but-for cause of the decision to reshuffle Joseph's ethics duties, Solomon's complaint still was not the *proximate* cause of Chairman Pearce's decision because there was a superseding cause in between—namely, the independent evaluation of an official at the OGE, which was accepted by the Chairman. See Ransom v. McDonald, 211 F. Supp. 3d 122, 127 (D.D.C. 2016) ("[Staub] requires that the retaliating supervisor's act is the *proximate* cause, not just the but-for cause, of the adverse employment action . . . . [P]laintiff advances a theory of but-for causation, but that chain of causation is broken by an independent [] inquiry."). To be sure, the Supreme Court in Staub explained that the "mere conduct of an

independent investigation" or the separate judgment of the ultimate decisionmaker will not always break the causal chain between a supervisor's bias and an adverse employment action if the final decisionmaker "takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." 562 U.S. at 421. Here, however, the Court is assured that Chairman Pearce separately justified his decision based on the OGE's independent assessment that Joseph's recusal was warranted for reasons independent of Solomon's supposed "original biased action." Id.; see also Walker, 798 F.3d at 1095 ("If the disciplinary committee [is] independent of and insulated from [the supervisor's] influence, that break in the chain . . . render[s] inoperative any illicit motive [he] might have had regarding the discipline."). This case therefore resembles Ransom, where the court found no cat's paw liability after the Office of the Inspector General conducted an independent assessment and the plaintiff "failed to produce any evidence that the findings of [its] inquiry were affected by retaliatory animus." 211 F. Supp. 3d at 127. Under those conditions, "regardless of the [initial impetus] for the investigation," the court found that the "results of the investigation were an independent review of the facts and, thus, a legitimate basis on which to take removal action." Id. The same is true here.[3]

Finally, regardless of her theory of retaliation, Joseph's claim regarding the removal of her DAEO duties fails for the independent reason that this decision does not rise to the level of a "materially adverse personnel action" necessary to state a retaliation claim. Leyden, 83 F. Supp. 3d at 245. As noted above, a materially adverse action is one that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of

---

[3] While Ransom was decided at summary judgment, Joseph's extensive pleadings on this matter lead to the same result at the motion-to-dismiss stage because they do not give rise to a reasonable inference that the OGE's determination was somehow tainted by Solomon.

discrimination." <u>Burlington</u>, 548 U.S. at 57.  A materially adverse action in the workplace typically involves "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." <u>Bridgeforth v. Jewell</u>, 721 F.3d 661, 663 (D.C. Cir. 2013) (cleaned up).  A loss of supervisory duties may constitute a materially adverse employment action, but only when the responsibilities have been "significantly diminished." <u>Geleta v. Gray</u>, 645 F.3d 408, 411 (D.C. Cir. 2011).

The Court does not find it plausible that a reasonable worker would be dissuaded from reporting discrimination by the limited and reasonable actions that Chairman Pearce took to avoid any appearance of a conflict between the DAEO and the individuals named in her complaint.  Joseph suffered no demotion or decline in pay, as she continued to serve as the DAEO and retained oversight authority over every officer at the agency outside of the handful who were named in her ongoing EEO complaint.  And, contrary to Joseph's contention that the recusal had no termination date, the Court finds it implausible to believe that the recusal would last in perpetuity after her complaint had reached a resolution. <u>See</u> Pearce Memo at 1 (referring to those named in her "*pending* EEO complaint" (emphasis added)); <u>see also</u> <u>Ramos v. Garland</u>, 77 F.4th 932, 939–40 (D.C. Cir. 2023) (finding no materially adverse employment action where agency "provided legitimate, nonretaliatory reason" for reassigning employee's duties and "the reassignment was temporary").  It blinks reality that this proportional and appropriate response would cause any reasonable employee to think twice before coming forward with allegations of misconduct.  Indeed, one might hope that an employee steeped in ethics experience would have undertaken the recusal unilaterally.

For the reasons above, the Court will grant the Board's motion to dismiss all claims stemming from the decision to recuse Joseph from certain duties as the DAEO and, accordingly, deny Joseph's motion for summary judgment on that claim as moot.

D. FAD Finding Discrimination

The final alleged "adverse employment action" that Joseph challenges is the agency's finding she and her deputy discriminated against Michael Gonzalez, a supervisor within her unit. Although Joseph offers no concrete evidence suggesting that the FAD was itself the product of discrimination or retaliation, the Court concludes that Joseph has alleged just enough to proceed past the motion to dismiss.

Joseph first contends that Solomon and his surrogates may have influenced the FAD. In doing so, she notes that agency counsel had called Gonzalez's complaint a "slam dunk" for management and "expressed strong misgivings" about its merits. Compl. ¶¶ 63, 65. It thus came as a shock when the EEO found Joseph and her deputy had engaged in discrimination while simultaneously absolving the three other managers named in the complaint, including Solomon. Id. ¶ 64. Joseph contends that this surprise turn of events can be explained only by the fact that the FAD was issued "at a time when she was challenging" Solomon's efforts to oust her and that the FAD's "adverse findings" undermined her own EEO complaint and justified "further action" against her. Opp'n at 31. She also notes that the FAD was issued "shortly after the protected activity," thus "permit[ting] an inference of retaliatory motive." Id.; see Woodruff v. Peters, 482 F.3d 521, 529 (D.C. Cir. 2007) (holding "[t]emporal proximity can indeed support an inference of causation . . . where the two events are 'very close' in time" (citations omitted)). And not only did Solomon have a motive to interfere, Joseph argues, he also had ample opportunity to do so because (1) Abruzzo oversaw the EEO office at the time that it issued the FAD; (2) during the

investigation, Abruzzo was in frequent communication with Gonzalez; and (3) contrary to NLRB policy, Solomon's deputy reviewed the FAD prior to its release.

Viewed in isolation, such speculation that Solomon may have interfered with the EEO's decision-making to immunize himself while pinning a potentially meritless claim on Joseph is not sufficient to plausibly allege the FAD was either discriminatory or retaliatory.  But paired with Joseph's second set of allegations relating to the agency's past settlement practices, there is just enough to "nudge[ ]" the theory "across the line from conceivable to plausible."  Twombly, 550 U.S. at 570.

The complaint alleges there has *never* been a FAD finding discrimination in the entire history of the NLRB because, in the past, management always has settled meritorious claims before its EEO ruled that the agency charged with enforcing workers' rights had itself violated Title VII.  See Compl. ¶ 67.  But, for whatever reason, management did not follow that normal course here, at least as Joseph tells it.  Instead, it allegedly decided to enter into a generous settlement with Gonzalez *after* the agency already had issued a FAD finding, for the first time in its history, that an individual within its ranks was guilty of discrimination.  See Opp'n at 29–30. That the individual just so happened to be Joseph—who was in the throes of a protracted dispute with the Acting General Counsel and in the midst of her own EEO complaint—raises colorable concerns that Joseph may have been singled out for special treatment.

Drawing all reasonable inferences in Joseph's favor, the allegations here are sufficient to survive the motion to dismiss.  At summary judgment, absent a smoking gun showing Solomon did in fact influence the EEO's decision, the outcome here will likely turn on whether the Board can adequately explain why it decided not to settle this matter beforehand and how the decision to issue a FAD finding discrimination comports with its prior practices.

E.  Hostile Work Environment

Beyond challenging the four "adverse actions" above, Joseph separately alleges that she suffered from a hostile work environment during the relevant period here.  See Compl. ¶ 69.  The allegations under this banner are relatively thin, as Joseph contends in mainly broad strokes that she was subjected to a barrage of offensive behavior that altered the conditions of her employment.  See id.  In addition to the allegations discussed above, Joseph also claims that agency officials excluded her from meetings involving her programs; subjected her to "ambush" meetings; used racially offensive language such as "you people" and "overseer"; violated her privacy rights; screamed at her; and refused to furnish information.  Id.

Standing on their own, these additional allegations do not plausibly allege treatment that was sufficiently "severe or pervasive" to violate Title VII, see Harris, 510 U.S. at 21, or that this treatment was linked to a protected trait, see Kilby-Robb v. Duncan, 210 F. Supp. 3d 150, 163 (D.D.C. 2016).  But the Court cannot view these allegations in isolation.  The D.C. Circuit has made clear that courts should consider incidents of allegedly adverse employment action when assessing whether the alleged mistreatment satisfied the demanding standard of a hostile work environment.  See Brooks v. Grundmann, 748 F.3d 1273, 1278 (D.C. Cir. 2014).  To be sure, a "plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard."  Id. (quoting Baird v. Gotbaum, 662 F.3d 1246, 1252 (D.C. Cir. 2011).  In the mine-run of cases, then, the "mere reference to alleged disparate acts of discrimination against [a] plaintiff cannot be transformed, without more, into a hostile work environment."  Childs–Pierce v. Util. Workers Union of Am., 383 F. Supp. 2d 60, 79 (D.D.C. 2005), aff'd, 187 Fed. App'x 1 (D.C. Cir. 2006).  "[B]ut a hostile work environment claim is not rendered invalid 'merely because it contains discrete acts that the plaintiff claims

(correctly or incorrectly) are actionable on their own.'"  Brooks, 748 F.3d at 1278 (quoting

Baird, 662 F.3d at 1252).  Here, Joseph's allegations that high-ranking Board officials conspired

to oust her—by, among other things, issuing an official finding that she had discriminated

against another employee in her division—fall far outside the norm and, if proven, possibly

could support a hostile work environment claim.

Accordingly, for present purposes, the Court must assume that Joseph will prevail on the

remaining three adverse actions above and ask whether, as a whole, these alleged actions would

constitute a severe and pervasive pattern of harassment.  Under that assumption (which very well

may not hold true), the Court cannot conclude at this stage that Joseph failed to allege a plausible

hostile work environment claim.  This matter is therefore better addressed at summary judgment

when there is a developed record on the remaining adverse-action claims.

**IV.  Conclusion**

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 11] the NLRB's Motion to Dismiss is GRANTED in part and

DENIED in part; it is further

**ORDERED** that [Dkt. No. 17] Joseph's Motion for Partial Summary Judgment is

DENIED as moot; it is further

**ORDERED** that the Board file its Answer by April 20, 2024.

**SO ORDERED**.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date: March 20, 2024

30