**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GLORIA JOSEPH**, | |
| Plaintiff, | |
| v. | Case No. 22-cv-2881 (CRC) |
| **MARVIN KAPLAN**, Chairman, National Labor Relations Board,[1] | |
| Defendant. | |

**MEMORANDUM OPINION**

Plaintiff Gloria Joseph was, at one point in time, the highest-ranking African American woman at the National Labor Relations Board ("NLRB").  As the NLRB's Director of Administration, she oversaw several of the agency's components, including its human resources and financial management branches.  But that changed when Lafe Solomon became the NLRB's Acting General Counsel and Joseph's supervisor.  Before Solomon assumed this position, Joseph had lodged (and ultimately settled) an administrative complaint of race and gender discrimination against him and several other agency officials.  Joseph alleges that after Solomon became Acting General Counsel in 2010, he took away significant portions of her managerial responsibilities.  By July 2012, Joseph no longer supervised the human resources branch, and the agency had created a new Chief Financial Officer position to oversee the various financial management branches.  On top of that, the agency issued a Final Agency Decision ("FAD") concluding that Joseph had discriminated against a supervisor in her division.

---

[1] By substitution pursuant to Fed. R. Civ. P. 25.

After retiring from the NLRB and exhausting her administrative remedies, Joseph filed this lawsuit, alleging that the agency's actions were discriminatory, amounted to retaliation, and created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").  The Court denied the agency's motion to dismiss the complaint in part, concluding that Joseph had plausibly alleged a connection between her administrative complaints against Solomon and the adverse personnel actions against her.  See Joseph v. McFerran, 725 F. Supp. 3d 42 (D.D.C. 2024) (Cooper, J.).  With discovery complete, the NLRB now moves for summary judgment.  It contends that there were legitimate reasons for its employment actions, and Joseph cannot show that those reasons are pretextual.  Joseph opposes the agency's motion, but she fails to identify evidence in the record supporting her assertions.  In the absence of a genuine dispute of material fact, the Court will grant summary judgment in favor of the NLRB.

## I.    Background

Joseph worked at the NLRB from 1973 until her retirement in 2012.  See Def.'s Statement of Undisputed Material Facts ("SUMF"), Ex. 1 at 80.  In 1990, she became the agency's Director of Administration.  Id.  Within that role, she supervised seven branches, including the Budget, Finance, and Acquisitions Branches (collectively, the "Financial Management Branches") and the Human Resources Branch.  Id. at 86.  She also supervised the agency's government-wide ethics program.  Id.

In 2008, Joseph filed an Equal Employment Opportunity ("EEO") complaint related to changes that the then-Chairman of the NLRB made to her performance appraisal.  Id., Ex. 5 at 69–72.  Her complaint alleged that the Chairman and other agency officials, including Solomon, engaged in race and sex discrimination.  Id.  Specifically, she contended that Solomon adversely

2

influenced her performance appraisal through his participation in a performance review board and his role as an "unofficial advisor" to the NLRB Chairman.  Id. at 69.  The parties ultimately settled Joseph's EEO complaint in March 2009.  Id., Ex. 1 at 81.  The following year, President Obama appointed Solomon as NLRB Acting General Counsel, thus making him Joseph's second-line supervisor.  See id. at 80; id., Ex. 4 at 179.

    A.  Human Resources Branch

Shortly after his appointment as Acting General Counsel, Solomon learned of several problems within the Division of Administration.  Id., Ex. 4 at 184–85.  First, the Chief of the Facilities Branch left the agency after five months, at least in part because of Joseph's management style.[2]  See id., Ex. 5 at 86–87; id., Ex. 12 at 967–69; id., Ex. 13 at 1352–53.  Second, Joseph hired a new Chief of the Facilities Branch without consulting Solomon.  Id., Ex. 4 at 185.  Third, other managers and administrators complained of "hostile working conditions" and "favoritism" within the division.  Id.; see also id., Ex. 11 at 839; id., Ex. 13 at 1354–57; id., Ex. 16 at 1333–35.  Fourth, the Chief of the Human Resources Branch resigned after only a few months in the position.  In her exit interview, she explained that she wanted to withdraw her candidacy before accepting the position, but Joseph's deputy pressured her to change her mind and downplayed the "problems" within the branch.  Id., Ex. 4 at 184–85; id., Ex. 12 at 1025–26; id., Ex. 16 at 1333–35.

In light of these indications of "hostile working conditions" within the Division of Administration, Solomon felt "a legal and moral obligation to formally address the[] concerns."

---

[2] In describing the criticisms of Joseph's management style, the agency's statement of undisputed material facts cites transcript pages that do not appear in the record.  See, e.g., SUMF ¶¶ 16–18, 20.  At the summary judgment stage, the Court relies only on the materials provided in the record, not the agency's unsupported assertions.

Id., Ex. 4 at 185.  So he engaged Ellyn McKay, an outside consultant who had previously worked with the NLRB, to speak with the division's staff and assess the workplace environment.  Id.; id., Ex. 11 at 840–42.  McKay surveyed and interviewed dozens of employees within the Division of Administration, and she prepared a report (the "McKay Report") detailing her findings.  Id., Ex. 18 at 741–82.  Among other things, the McKay Report concluded that the Human Resources Branch was "on life support and in a state of crisis."  Id. at 782.  The report urged the agency's leadership to "initiate a significant, meaningful, and immediate intervention" due to alarming turnover levels in the branch.  Id. (emphasis omitted).  It further recommended that the Division of Administration be "restructured in a more productive way and in a way that provides a more supportive, collaborative, and fair environment for employees."  Id.  In Solomon's estimation, the McKay Report identified "disturbing issues within the Division of Administration" that "needed to be addressed."  Id., Ex. 11 at 845–46.

In January 2012, Joseph presented a critique of the McKay Report's process and recommendations.  See id., Ex. 19 at 203.  But Solomon was unmoved; he concluded that the Human Resources Branch was "simply not functioning as it should," and that Joseph's counterproposal did not "adequately address how to improve operations, productivity[,] and employee morale." [3]  Id. at 204.  Accordingly, Solomon appointed a new Chief of the Human Resources Branch and asked Jennifer Abruzzo, his executive assistant, to oversee the branch's reorganization.  Id. at 204–05.  As a result of the reorganization, Solomon and the NLRB Chairman decided that the Human Resources Branch "would be separated from the Division of Administration" and "report directly to the Office of General Counsel."  Id., Ex. 4 at 189–90; see

---

[3] Joseph's own deputy agreed that the Division of Administration workplace could be described as "low trust, stress, frustrating, [and] intimidating."  SUMF, Ex. 2 at 651.

4

also id., Ex. 20 at 207.  So, as of July 2012, the Human Resources Branch was no longer under Joseph's supervision.

     B.  Financial Management Branches

Around the same time Solomon sought to correct issues within the Human Resources Branch, he also attempted to restructure the NLRB's Financial Management Branches.  This effort began after audits of the agency's financial statements revealed a "significant deficiency" in its internal financial controls.  Id., Ex. 4 at 194; id., Ex. 21 at 294; see also id., Ex. 22 at 339. For example, the 2010 audit found that the NLRB failed to comply with the *bona fide* needs rule, see 31 U.S.C. § 1502(a), the recording statute, see id. § 1501(a)(1), and the Antideficiency Act, see id. § 1301(a); SUMF, Ex. 21 at 299–300.  In light of the NLRB's noncompliance, Solomon initiated a review of the agency's financial structure.  SUMF, Ex. 11 at 871–72; id., Ex. 26 at 334–35; id., Ex. 27 at 373–74.  He and the NLRB Chairman employed the National Academy of Public Administration ("NAPA"), an independent non-profit organization, to conduct an audit and recommend "potential changes to [the agency's] financial management structure, functions[,] and processes."  Id., Ex. 15 at 738; see also id., Ex. 11 at 871–72.  NAPA was also tasked with providing "recommendations regarding the scope and need for a Chief Financial Officer . . . position to improve [the] NLRB's financial management structure."  Id., Ex. 28 at 255; id., Ex. 29 at 376.

NAPA issued a final report in June 2012.  Id., Ex. 28 at 253; id., Ex. 29 at 375.  It concluded that the agency had a "weak financial management culture," lacked a "single financial 'go-to' person," and did not have sufficient "financial management skill-sets" to "meet present day challenges."  Id., Ex. 29 at 377–79.  To address these deficiencies, NAPA endorsed the creation of a Chief Financial Officer position that would oversee the Financial Management

Branches and report directly to the General Counsel. Id. at 379–80. Based on NAPA's recommendation, the NLRB's five-member board voted to create the Chief Financial Officer position. Id., Ex. 8 at 723; id., Ex. 9 at 587–89. In July 2012, the Financial Management Branches were moved from the Division of Administration to the Chief Financial Officer's office. Id., Ex. 8 at 727.

   C. Finding of Discrimination

In early 2012—the same period in which Solomon reorganized the Division of Administration—Joseph was the subject of an EEO complaint. See id., Ex. 10 at 1290–91. Michael Gonzalez, a former supervisor within the Human Resources Branch, alleged that Joseph and other Division of Administration supervisors discriminated and retaliated against him by downgrading his performance appraisal, reclassifying him to a non-supervisory position, denying him a promotional opportunity, and relocating his office space. Id. at 1290; id., Ex. 30 at 1097. In July 2012, the agency's Office of Equal Employment Opportunity ("OEEO") drafted a FAD concluding that the agency (1) discriminated against Gonzalez based on his sex, color, and national origin, and (2) retaliated against him based on his prior EEO activity. Id., Ex. 10 at 1310–11. The OEEO Director and the agency's Deputy General Counsel reviewed the draft FAD before it was finalized. Id., Ex. 30 at 1095–96; id., Ex. 31 at 1315–18. The Deputy General Counsel did not make any substantive changes, and the final FAD issued in July 2012. Id., Ex. 3 at 1078; id., Ex. 10 at 1313; id., Ex. 32 at 932. Neither the OEEO Director nor the Deputy General Counsel communicated with Solomon about the FAD prior to its release. See id., Ex. 3 at 1080; id., Ex. 4 at 197–98; id., Ex. 32 at 932.

Joseph retired from the NLRB in August 2012, almost 50 years after she joined the agency. See id., Ex. 1 at 80.

6

D.  Procedural History

After exhausting her administrative remedies, Joseph filed this lawsuit in September 2022.  Compl. ¶¶ 10–12.  Her complaint alleged that the NLRB discriminated against her based on her race and sex, retaliated against her for engaging in protected activity, and created a hostile work environment in violation Title VII.[4]  See id. ¶¶ 70–72.  The agency filed a motion to dismiss, which the Court granted in part and denied in part.  Specifically, the Court found that Joseph's allegations—including her claim that Solomon "tarnish[ed] her reputation and "remove[d] her from key posts" after she engaged in protected activity—cleared the "low bar of plausibility."  Joseph, 725 F. Supp. 3d at 54.  Joseph's claims regarding the removal of the Human Resources Branch from her supervision, the reorganization of the Financial Management Branches, the FAD finding that she discriminated against Gonzalez, and the creation of a hostile work environment thus proceeded to discovery.[5]  Id.

The agency now moves for summary judgment on Joseph's remaining claims.  It submits that all of the adverse personnel actions described in Joseph's complaint were the result of employee complaints, independent audits, and evidence of mismanagement, not discrimination or retaliation.  See Mem. in Supp. of Def.'s Mot. for Summ. J. ("Mot. for Summ. J.") at 9–10. Joseph contends that the agency's proffered reasons for its actions are pretextual, but as described below, she does not identify specific evidence in the record to support her arguments.

---

[4] Joseph also brought a claim of age discrimination under the Age Discrimination in Employment Act of 1967, see Compl. ¶¶ 73–76, but she failed to plausibly allege that the agency's actions were based on her age, see Joseph, 725 F. Supp. 3d at 54 n.1.

[5] The Court dismissed Joseph's additional claim that the NLRB Chairman retaliated against her by asking her to recuse herself from certain ethical oversight duties.  See Joseph, 725 F. Supp. 3d at 59–60.

See Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Opp'n") at 26–27.  The agency's motion is fully briefed.

## II.    Legal Standards

A court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the Court examines "all relevant evidence presented by the plaintiff and defendant."  Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 495 (D.C. Cir. 2008).  The Court resolves all factual disputes and draws "all justifiable inferences" in favor of the nonmoving party.  Anderson, 477 U.S. at 255; see also Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  The non-moving party must offer more than mere allegations or denials; instead, it must support its opposition with affidavits, declarations, or other competent evidence providing specific facts that establish a genuine issue for trial.  Fed. R. Civ. P. 56(c); Guillen-Perez v. District of Columbia, 415 F. Supp. 3d 50, 57 (D.D.C. 2019) (Cooper, J.).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial," then the moving party is entitled to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### III.  Analysis

In her opposition to the agency's summary judgment motion, Joseph maintains that she was "subjected to repeated, targeted, and demeaning treatment" during her final year at the NLRB that was "linked to discriminatory and retaliatory motives."  Opp'n at 27.  But because she has not shown that the agency's non-discriminatory, non-retaliatory explanations for its personnel decisions are pretextual or otherwise subject to reasonable dispute, the agency is entitled to summary judgment.

#### A.  The Government's Statement of Undisputed Facts

Before turning to the merits of the agency's motion, the Court must first address the parties' statements of undisputed facts.  The Federal Rules of Civil Procedure and the Local Rules of this Court describe the means by which a party may identify genuine issues of material fact at summary judgment.  Under the Federal Rules, a party asserting that a fact is genuinely disputed must "cit[e] to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); see Oviedo v. Wash. Metro. Area Transit Auth., 948 F.3d 386, 396 (D.C. Cir. 2020) ("[T]he Federal Rules of Civil Procedure explicitly require a party opposing summary judgment to support an assertion that a fact is genuinely disputed with materials in the record.").  The Local Rules, in turn, "address the form for providing the required support."  Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendment.  Under this Court's Local Rules, a party moving for summary judgment must provide "a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement."  Local Civ. R. 7(h)(1).  When responding to a motion for summary judgment, the opposing party must provide "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to

be litigated, *which shall include references to the parts of the record relied on to support the statement*." Id. (emphasis added).

The agency's motion for summary judgment is accompanied by a "statement of undisputed material facts," which includes citations to specific pages of the record across 32 exhibits. See SUMF at 1. Joseph responds to each statement in her opposition, but she does not provide any citations to the record. See generally Opp'n at 4–25.[6] Instead, many of her responses dispute the agency's facts without evidentiary support, see, e.g., id. at 19 (disputing that the McKay Report "reflected substantial discontent among the Division of Administration personnel" and claiming that it "reflected the content desired by Abruzzo"); assert that certain other facts are undisputed, see, e.g., id. at 7 (claiming that it is "undisputed" that the FAD improperly "absolved" Solomon of liability); or object to the agency's facts on evidentiary grounds, see, e.g., id. at 11 (describing an agency employee's statement to Abruzzo as hearsay).[7] Observing that Joseph's opposition did not "include any references to any record evidence whatsoever," the agency asked the Court to "rule that [she] has failed to establish any material issues of fact that preclude summary judgment." Reply in Further Supp. of Summ. J. ("Reply Br.") at 1–2. But because Joseph is *pro se*, the Court gave her another chance to respond to the agency's statement of undisputed material facts. See Order (ECF No. 44) at 2–3. The Court explicitly reminded Joseph that she must comply with Local Rule 7(h), and if she failed to do so,

---

[6] Joseph responds to 52 of the 53 paragraphs in the government's statement of undisputed material facts; she does not respond to paragraph 28. See Opp'n at 16; Reply in Further Supp. of Summ. J. at 2 n.1.

[7] Joseph also attached—without context—three documents related to her most recent EEO complaint, including two EEO affidavits and a rebuttal to Solomon's EEO affidavit.

the Court "may treat [the agency's] statement of facts as conceded." Id. at 3.  Joseph did not respond.

"Requiring strict compliance with [Local Rule 7(h)] is justified both by the nature of summary judgment and by the rule's purposes."  Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 150 (D.C. Cir. 1996) (quoting Gardels v. CIA, 637 F.2d 770, 773 (D.C. Cir. 1980)) (referring to Rule 7(h)'s predecessor).  After all, the parties are "most familiar with the litigation and the record," and they can "crystallize for the district court the material facts and relevant portions of the record."  Id. at 151; see also Gardels, 637 F.2d at 773 (explaining that the rule "isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record").  But when a party fails to provide specific citations to the record, it deprives the opposing party of "an opportunity to render a meaningful and targeted response."  Glass v. Lahood, 786 F. Supp. 2d 189, 199 (D.D.C. 2011), aff'd, No. 11-5144, 2011 WL 6759550 (D.C. Cir. Dec. 8, 2011).  It also requires the Court to "sift through the record," which it is under no obligation to do.  SEC v. Banner Fund Int'l, 211 F.3d 602, 616 (D.C. Cir. 2000) (citation omitted); see Twist v. Meese, 854 F.2d 1421, 1425 (D.C. Cir. 1988) ("[A] district court judge should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make his own analysis and determination of what may, or may not, be a genuine issue of material disputed fact.").  Accordingly, when a party's response to a statement of undisputed material facts fails to comply with Local Rule 7(h), the Court is "perfectly within its authority" to consider those facts as "undisputed for purposes of the [summary judgment] motion."  Oviedo, 948 F.3d at 397–98 (quoting Fed. R. Civ. P. 56(e)(2)).

11

This rule applies equally to *pro se* plaintiffs, especially when the Court directs the Plaintiff to the specific rule. See, e.g., id. at 397; Jiggetts v. Cipullo, 774 F. Supp. 3d 168, 179 n.2 (D.D.C. 2025); Adams v. U.S. Dep't of the Navy, No. 17-cv-1618 (RDM), 2025 WL 870365, at *4 (D.D.C. Mar. 20, 2025).  In this case, the Court did so twice.  In its initial scheduling order, the Court reminded the parties of "Local Civil Rule 7(h) regarding the requirements for motions for summary judgment and oppositions."  Scheduling Order (ECF No. 30) ¶ 7.  When Joseph's opposition brief failed to comply with Local Rule 7(h), the Court reminded her again.  See Order (ECF No. 44) at 1 ("While Plaintiff's response contains plenty of factual allegations and legal arguments, it is short on citations to the record." (citing Local Civ. R. 7(h))).  Especially since Joseph failed to heed the Court's repeated warnings, the Court may treat the agency's statement of material facts as undisputed.  Oviedo, 948 F.3d at 397–98.[8]

The Court now moves to the merits of the NLRB's motion for summary judgment on Joseph's claims.

### B.  Discrimination and Retaliation Claims

Joseph's discrimination and retaliation claims under Title VII share the same premise: Solomon purportedly "had it out for her," an African American woman, and "leveraged his influence to oust her from various posts" within the Division of Administration.  Joseph, 725 F. Supp. 3d at 53.  She acknowledges that the agency has put forward non-discriminatory and non-

---

[8] Notwithstanding Joseph's failure to comply with Local Rule 7(h), the Court "shall disregard all proffered facts contained in [the agency's statement of undisputed material facts] that are not properly supported by record evidence."  Footbridge Ltd. Tr. v. Zhang, 584 F. Supp. 2d 150, 154 (D.D.C. 2008), aff'd, 358 F. App'x 189 (D.C. Cir. 2009).  The Court will also consider "evidence helpful to [Joseph] that it came across in reviewing the cited portions of the record."  Jiggetts, 774 F. Supp. 3d at 179 n.2.

retaliatory reasons for its personnel decisions and FAD finding, but she submits that the agency's explanations are pretextual.  See Opp'n at 26–27.

"Title VII prohibits federal agencies from discriminating against their employees on account of race [and sex] and from retaliating against them for asserting their rights under Title VII."  Calhoun v. Johnson, 632 F.3d 1259, 1261 (D.C. Cir. 2011) (citations omitted).  In the absence of direct evidence of discrimination or retaliation, Joseph's claims are evaluated under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Jeffries v. Barr, 965 F.3d 843, 860 (D.C. Cir. 2020) (applying the burden-shifting framework to both discrimination and retaliation claims).  Under the McDonnell Douglas framework, Joseph must first establish a prima facie case of discrimination.  Figueroa v. Pompeo, 923 F.3d 1078, 1086 (D.C. Cir. 2019).  If she does, "the burden then shifts to the [NLRB] to articulate a legitimate, nondiscriminatory reason for its action."  Id. (quoting Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016)).  If the agency provides a legitimate basis for its personnel decisions, "the 'burden then shifts back' to [Joseph], who must prove that, despite the proffered reason, she has been the victim of intentional discrimination."  Id. (quoting Wheeler, 812 F.3d at 1114).

"The D.C. Circuit, however, has instructed that when considering a motion for summary judgment in an employment discrimination case, a district court need not consider whether a plaintiff has actually satisfied the elements of a prima facie case if the defendant has offered a legitimate, non-discriminatory reason for its actions."  Musgrove v. Gov't of D.C., 775 F. Supp. 2d 158, 169 (D.D.C. 2011) (citing Brady, 520 F.3d at 494).  Because the agency has proffered non-discriminatory and non-retaliatory reasons for its decisions, the McDonnell Douglas framework collapses into a single question:  "Has the employee produced sufficient evidence for

13

a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?"  Brady, 520 F.3d at 494; see also Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (explaining that once an employer provides a non-retaliatory explanation for its actions, "the only question" is whether the employee has identified a genuine dispute as to whether "a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence" (citation and internal quotation marks omitted)).  Put another way, is the agency's stated reason pretextual?

To answer this question, the Court considers whether a jury could "infer" race or sex discrimination based on (1) "the plaintiff's *prima facie* case"; (2) "any evidence the plaintiff presents to attack the employer's proffered explanation for its actions"; and (3) "any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer."  Wheeler, 812 F.3d at 1114 (alteration in original) (quoting Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)); see also Jones, 557 F.3d at 677 (explaining that courts assess whether a jury could "infer" retaliation based on the plaintiff's prima facie case, the plaintiff's evidence attacking the employer's explanation, and other evidence of retaliation).  Ultimately, the "burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Wheeler, 812 F.3d at 1114 (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981)).

### 1.  *Human Resources Branch*

Joseph first claims that the NLRB discriminated and retaliated against her by removing the Human Resources Branch from her supervision.  See Compl. ¶ 72(a).  The agency submits

that the branch was placed under new leadership because of "complaints received from employees regarding [Joseph's] management style and the high levels of employee attrition in the [b]ranch." Mot. for Summ. J. at 9. Joseph retorts, without citation, that this explanation is not credible because her "long record of high performance, recent positive appraisals, and commendations sharply contradict the [agency's] sudden claim that she was an ineffective manager." Opp'n at 26. In other words, Joseph contends that any scrutiny of her job performance was unwarranted.

"Evidence indicating that an employer misjudged an employee's performance . . . is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination." Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citation omitted). A plaintiff may also establish an inference of pretext by showing that the employer's stated reasons for a personnel decision were "inconsistent or dishonest" or "deviat[ed] from established procedures or criteria." Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015); see also Brady, 520 F.3d at 495 (explaining that an employee may establish pretext by "demonstrat[ing] that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision"). But "proving that an employer's reason is false will not always be sufficient to demonstrate pretext." George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005). Instead, the relevant question is whether the employer's "stated *belief* about the underlying facts is reasonable in light of the evidence." Brady, 520 F.3d at 495 (emphasis added). If the employer's belief is reasonable, then "there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." Id. Accordingly, the employer can prevail on a motion for summary judgment by showing "the absence of a genuine dispute in the record over whether [the decisionmaker] honestly and reasonably believed in th[e]

15

reasons" for the employment action.  George, 407 F.3d at 415; see also Fischbach, 86 F.3d at 1183 ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason." (quoting Pignato v. Am. Trans Air, Inc., 14 F.3d 342, 349 (7th Cir. 1994))); Woodruff v. Peters, 482 F.3d 521, 531 (D.C. Cir. 2007) (applying the same standard to a retaliation claim).

As described above, the agency has identified considerable evidence corroborating its explanation for why it removed the Human Resources Branch from Joseph's purview.  After his appointment as Acting General Counsel, Solomon learned of "widespread dissatisfaction among managers and employees in the Division of Administration."  SUMF ¶ 22.  For example, at least four branch managers expressed concerns about Joseph's leadership style.  See, e.g., id., Ex. 12 at 1009–10; id., Ex. 13 at 1352 (former Chief of the Facilities Branch explaining that she was leaving the agency because Joseph and her deputy were a "bad team"), 1354 (Chief of the Library Branch describing Joseph and her deputy as "a very bad combination"), 1355 (Deputy Chief of the Facilities Branch expressing concern that Joseph would not give her a "fair shake" for a promotion to the vacant branch chief position), 1356 (Chief of the Budget Branch stating that she "had a good relationship" with Joseph but was "kept in the dark" about certain decisions).[9]  The agency also hired a new Chief of the Human Resources Branch in 2011, but she resigned after only a few months due to dysfunction within the branch.  See id., Ex. 11 at 877; id., Ex. 15 at 734; id., Ex. 16 at 1333–35 (describing the "hostile work environment" within the Human Resources Branch and critiquing Joseph's handling of her resignation).

---

[9] Joseph dismisses these statements by Division of Administration employees as "uncorroborated hearsay."  Opp'n at 13.  But if presented at trial, these statements would not be offered "to prove the truth of the matter asserted."  Fed. R. Evid. 801(c)(2).  Instead, the agency would offer them to justify Solomon's belief that employees within Division of Administration were dissatisfied and explain why he commissioned the McKay Report.  See Reply Br. at 4.

Because of these and other "ongoing problems" within the Division of Administration, Solomon brought on Ms. McKay to assess the division's workplace culture and report her findings. SUMF ¶ 31; see id., Ex. 11 at 840–44. After conducting surveys and interviews of employees, McKay concluded that the Human Resources Branch was "in a state of crisis" and required "immediate intervention." Id., Ex. 18 at 782 (emphasis omitted). Her report suggested that the branch should be restructured as an independent division, incorporated within another division, or outsourced entirely. Id. In light of the McKay Report and Ms. Abruzzo's subsequent organizational study, Solomon and the NLRB Chairman removed the Human Resources Branch from the Division of Administration, placing it outside of Joseph's control. SUMF ¶¶ 39, 41; id., Ex. 4 at 189–90; id., Ex. 20 at 207. Because the agency has offered a "legitimate, non-discriminatory explanation" for its action, the remaining question is "whether [Joseph] produced sufficient evidence for a jury to find that the [explanation] was mere pretext for sex or race discrimination." Primas v. District of Columbia, 719 F.3d 693, 697 (D.C. Cir. 2013).

She has not done so. Again, Joseph has not cited to *any* evidence—beyond her own subjective commentary—indicating that the agency's explanation is pretextual. But even accepting her assertions at face value, they still do not add up to pretext. For example, she claims that she was not afforded an opportunity to "refute or contextualize the allegations" against her before Solomon commissioned the McKay Report.[10] Opp'n at 17. But the record indicates that after speaking with several branch chiefs, Solomon and Abruzzo *did* meet with Joseph to discuss the employees' dissatisfaction. See SUMF, Ex. 11 at 842–43; id., Ex. 12 at

---

[10] Joseph also describes the complaints against her as "anonymous accusations," Opp'n at 17, but Solomon and Abruzzo knew the employees' identities, see SUMF, Ex. 11 at 839; id., Ex. 12 at 967–68, 1008–09.

970; id., Ex. 13 at 1358–61.  Joseph further alleges that the McKay Report was "directed by Abruzzo and reflected the content desired by Abruzzo."  Opp'n at 19.  She alludes to e-mail exchanges between Abruzzo and McKay "wherein McKay was given guidance about the content of the assessment," id., but these e-mails do not appear in the record.  And as for Abruzzo's efforts to reorganize the Division of Administration in response to the McKay Report, Joseph accuses her of lacking "program responsibility for human resources" and being unable "to make informed decisions."  Id. at 21.  But Joseph cannot show pretext by "simply criticizing the employer's decisionmaking process."  Hairston v. Vance-Cooks, 773 F.3d 266, 272 (D.C. Cir. 2014).  In the absence of a genuine dispute that the NLRB removed the Human Resources Branch from the Division of Administration for non-discriminatory and non-retaliatory reasons, the agency is entitled to summary judgment.  See George, 407 F.3d at 415.

### 2. *Financial Management Branches*

Joseph next asserts that the NLRB discriminated and retaliated against her by placing the Financial Management Branches under the control of the agency's new Chief Financial Officer position.  Compl. ¶ 72(b).  At the motion to dismiss stage, the Court observed that this claim was "on weaker footing" because the agency's decision "was not necessarily targeted at [her] or an indictment of her managerial bona fides."  Joseph, 725 F. Supp. 3d at 56.  Now at summary judgment, the agency reiterates that this reorganization was "the result of pervasive evidence of mismanagement, along with recommendations from auditors and an independent entity that the [Financial Management] Branches be removed from the supervision of the Division of Administration."  Mot. for Summ. J. at 9.  Joseph opines that the decision contradicted "standard procedural norms," which "support[s] a finding of pretext."  Opp'n at 27.

18

Here too, Joseph comes up short.  The NLRB has cited ample evidence that it created the Chief Financial Officer position to address deficiencies in the agency's internal financial controls.  See SUMF ¶¶ 42–50.  Two financial audits revealed that the agency failed to comply with multiple accounting rules.  See id., Ex. 4 at 194; id., Ex. 21 at 299–300; id., Ex. 22 at 343.  To address these concerns, the agency initiated a "comprehensive review of the [its] financial management structure."  Id., Ex. 26 at 335.  The parties agree that, at Solomon's direction, the agency asked NAPA to interview employees and provide recommendations.  See SUMF ¶ 47; Opp'n at 24.  NAPA concluded that the existing structure within the Division of Administration did not "provide the integrated financial management needed by [the] NLRB," so it recommended that the agency appoint a Chief Financial Officer who would report to the General Counsel.  Id., Ex. 29 at 379–80.  Acting on that recommendation, the agency's five-member board created the Chief Financial Officer position and moved the Financial Management Branches within its purview.  Id., Ex. 8 at 723–24, 727.

Joseph does not dispute this timeline.  Instead, she contends that the agency's justification was pretextual because agency officials did not consult her and later barred her from attending the board's vote to create the Chief Financial Officer position.  See Opp'n at 22 ("Notably the persons in charge of the financial management [branches] were not consulted in any meaningful way and were specifically barred from attending the meeting where Solomon convinced the board to do something it would not have done without prompting from Solomon."), 27 (referencing Joseph's "exclusion from meetings or input on decisions").  But Joseph does not support her assertion with citations to the record, and the agency has provided evidence that she *was* consulted during the agency's review.  See, e.g., SUMF, Ex. 12 at 1036 (Abruzzo stating that Joseph and her deputy were "part of the initial discussions with NAPA");

19

id., Ex. 28 at 257 (NAPA work schedule listing a meeting with Joseph on June 4, 2012).

Moreover, there is no evidence that Solomon "convinced" the board to establish the Chief

Financial Officer position. See, e.g., id., Ex. 8 at 723 (NLRB Chairman indicating that the

board's decision was "based on the recommendation of and briefing by [NAPA], following its

study of the issue"); id., Ex. 9 at 588 (board member explaining that his "thinking about a chief

financial officer" was "informed" by his experience of implementing a similar structure in a prior

position). In the absence of evidence that NLRB officials deviated from agency procedures or

acted with an improper purpose, Joseph's "personal opinion" about the decision-making process

"is insufficient to surmount summary judgment." Vatel v. All. of Auto. Mfrs., 627 F.3d 1245,

1247 (D.C. Cir. 2011) (noting that "it is the perception of the decision maker which is relevant,

not the self-assessment of the plaintiff" (citation omitted)).[11]

### 3. FAD Finding

Joseph's remaining discrimination and retaliation claim relates to the FAD, which

concluded that she had discriminated and retaliated against Michael Gonzalez. See Compl.

¶ 72(d). In its summary judgment briefing, the agency explains that the FAD's factual findings

justify its conclusions, and there is no evidence that Solomon communicated with the OEEO or

was otherwise involved in the FAD process. See Mot. for Summ. J. at 10. Joseph responds that

the "unprecedented issuance" of the FAD, which singles her out "while exonerating others with

greater culpability," suggests that the agency acted with a "retaliatory motive." Opp'n at 27.

---

[11] Joseph also notes that Solomon advocated for the creation of the Chief Financial
Officer position well before he became Acting General Counsel. See Opp'n at 22. In her view,
this undercuts the agency's explanation that it hired NAPA because of the financial audits. See
id. But if anything, Solomon's preexisting views demonstrate that his actions were motivated by
a desire to reform the agency's financial structure, not an intent to discriminate or retaliate
against Joseph. See SUMF, Ex. 11 at 871 (Solomon explaining that he had "advocated for a long
time that there be a chief financial officer" in the agency).

The record indicates that the OEEO issued the FAD pursuant to its "general process." SUMF, Ex. 30 at 1094. Gonzalez filed a formal discrimination complaint in November 2011. Id., Ex. 10 at 1290. The OEEO investigated Gonazlez's claims and heard testimony from Joseph, her deputy, and the two directors of the Human Resources Branch during the relevant time period. Id. at 1291–92. An OEEO attorney-advisor then prepared a draft FAD, concluding that the agency (1) discriminated against Gonzalez on the basis of his sex, color, and national origin, and (2) retaliated against him for engaging in protected EEO activity. Id. at 1310–11; id., Ex. 31 at 1317. The OEEO Director reviewed the draft and sent it to the agency's Deputy General Counsel. Id., Ex. 3 at 1077; id., Ex. 30 at 1095. The Deputy General Counsel raised some questions about the FAD's underlying facts—not its reasoning or conclusions—and the OEEO "made [the facts] clearer" before issuing the final FAD in July 2012. Id. at 1096; id., Ex. 10 at 1313.

Joseph's unsupported critiques of the FAD process fall well short of establishing pretext. First, she claims that pursuant to agency protocols, EEO complaints "involving actions by the General Counsel" must be reviewed by an "outside entity." Opp'n at 25. However, she does not provide or cite to any agency protocols, and in any case, it is unclear how the allegations in Gonzalez's complaint relate to the General Counsel. See SUMF, Ex. 10 at 1292–1300. Second, Joseph accuses the Deputy General Counsel of acting as Solomon's "alter ego" during the FAD review process. Opp'n at 25. But again, she cites no evidence for this claim, and the record indicates that Solomon was not involved in the review or issuance of the FAD. See SUMF, Ex. 3 at 1080; id., Ex. 4 at 197–98; id., Ex. 30 at 1096. And even if the Deputy General Counsel did act under Solomon's supervision, her review of the FAD was limited to clarifying its summary of the facts, not influencing its analysis or legal conclusion. Id., Ex. 30 at 1096. Third, Joseph

faults the FAD for "singling [her] out."  Opp'n at 27.  While the FAD does mention Joseph, the conclusions about the agency's discriminatory and retaliatory practices are almost entirely directed at her deputy.  See, e.g., id., Ex. 10 at 1307 (noting that Joseph's deputy instructed the head of the Human Resources Branch to move Gonzalez's office); id. (concluding that Joseph's deputy "gave preferential treatment to non-Hispanic female employees"); id. at 1308 (finding that the "contradictory testimony" by Joseph's deputy and the then-Chief of the Human Resources Branch "established that [the] articulated reasons for [Gonzalez's] reassignment are unworthy of belief").  Because Joseph has not demonstrated why the agency's explanation for the FAD is disingenuous or should be disbelieved, the agency is entitled to summary judgment on Joseph's discrimination and retaliation claim.  Walker, 798 F.3d at 1092.

    C.  Hostile Work Environment Claim

In addition to her discrimination and retaliation claims, Joseph alleges that the NLRB violated Title VII by maintaining a hostile work environment.  See Compl. ¶¶ 69, 72.  As the Court explained at the motion to dismiss stage:

> The allegations under this banner are relatively thin, as Joseph contends in mainly broad strokes that she was subjected to a barrage of offensive behavior that altered the conditions of her employment.  In addition to the allegations [of discrimination and retaliation], Joseph also claims that agency officials excluded her from meetings involving her programs; subjected her to "ambush" meetings; used racially offensive language such as "you people" and "overseer"; violated her privacy rights; screamed at her; and refused to furnish information.

Joseph, 725 F. Supp. 3d at 61 (citations omitted); see also Opp'n at 27 ("Plaintiff was subjected to repeated, targeted, and demeaning treatment, including exclusion, scapegoating, punitive oversight, and aggression.").

To prevail on a hostile work environment claim, "a plaintiff must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment.'"  Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); see also Baird v. Gotbaum, 662 F.3d 1246,

1250 (D.C. Cir. 2011) (applying Baloch to a retaliatory hostile work environment claim).  "To

determine whether a hostile work environment exists, the court looks to the totality of the

circumstances, including the frequency of the discriminatory conduct, its severity, its

offensiveness, and whether it interferes with an employee's work performance."  Baloch, 550

F.3d at 1201 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)).

The Court previously determined that Joseph's "additional allegations" of offensive

behavior in the workplace, in isolation, did not "plausibly allege treatment that was sufficiently

'severe or pervasive' to violate Title VII."  Joseph, 725 F. Supp. 3d at 61 (quoting Harris, 510

U.S. at 21).  But the Court also considered Joseph's additional allegations alongside her

discrimination and retaliation claims.  Id. ("The D.C. Circuit has made clear that courts should

consider incidents of allegedly adverse employment action when assessing whether the alleged

mistreatment satisfied the demanding standard of a hostile work environment." (citation

omitted)).  Since the Court assumed for purposes of the motion to dismiss that Joseph would

prevail on those claims, it could not rule out that, "as a whole," they established a plausible

hostile work environment claim.  Id. at 62 (recognizing that the assumption "very well may not

hold true").

At the summary judgment stage, assumptions are not enough.  See Dormu v. District of

Columbia, 795 F. Supp. 2d 7, 17 (D.D.C. 2011) ("To defeat a motion for summary judgment, the

non-moving party must offer more than mere unsupported allegations or denials.").  As

explained above, Joseph has not established a genuine dispute of material fact as to whether the

agency's explanations for its employment actions against her were pretextual.  In turn, there is

23

also no genuine dispute of material fact as to whether those actions "constitute[d] a severe and

pervasive pattern of harassment." <u>Joseph</u>, 725 F. Supp. 3d at 62.  The Court will therefore grant

summary judgment to the NLRB on Joseph's hostile work environment claim as well.

## IV.   Conclusion

For the foregoing reasons, the Court will grant [39] Defendant's Motion for Summary

Judgment.  A separate Order shall accompany this memorandum opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>March 10, 2026</u>